All right, Ms. Chin-Kaplan, good morning. You may proceed. Good morning. My name is Louise Chin-Kaplan, and I represent the Ad Palantier. May it please the Court. We are here to determine today whether the Clay's Court committed legal error when it affirmed a judgment by the Special Master denying entitlement to the petitioner based on an improper legal standard. The standard articulated by this Court in Alton is that to prove a case under the Vaccine Act, a petitioner must provide the theory, a logical sequence of cause and effect, and the appropriate temporal relationship. Subsequent courts, Walther, Packard, and Drew, have added the requirement that the theory be biologically plausible. Biological plausibility has been considered to be something that is grounded in good science and medicine. In this instance... Does a theory have to be proven by preponderance of evidence in order for it to be a biologically plausible theory? Not in petitioner's view, Your Honor. The statute indicates that the petitioner must establish by a preponderance of the evidence based on the whole record. And the whole record would include the evidence of the respondent. In addition, Packard indicated that the decision must be based on the cumulative evidence. And in Capisano, this Court indicated that one prong could be used to support another prong. So under the first prong of the Alton test, what's the burden of proof there? The burden of proof is to provide a plausible biological theory that the vaccination can lead to the injury suffered by the petitioner. By a preponderance of evidence? Not according to the statute, Your Honor, because the statute requires that the evidence be proven based on the record as a whole. So that would include evidence that's submitted in prongs 2 and 3, as well as any evidence that the respondent would submit on alternative causes. The evidence, the case law says that evidence that's adduced properly under 2 and 3, under 2 can be used in 3, it can be used in 1. That is true, Your Honor. But I thought the case law said that each of the individual Alton elements have to be demonstrated by preponderance. There is at least one case that has stated that, Your Honor. However, that case came subsequent to Alton, and it never explicitly overruled Alton. And to this day, the entire bench has not addressed this particular issue. Isn't that the normal case where you have a preponderance of evidence standard and there are multiple elements to establish the case that you have to show preponderance for each one? Well, Your Honor, to use the example that was just provided, if prong 3 can be used to support prong 2, it would seemingly indicate that prong 2 doesn't need to be established by a preponderance of the evidence because it's being supported by prong 3. Well, the fact that one supports the other doesn't necessarily mean that that relieves you of the preponderance of evidence burden with respect to all three elements. Based on the record as a whole, yes, we would agree with that. Of course, based on the record as a whole. Yes, not as to each individual prong. So in this particular instance, Your Honor, our requirement was to provide a plausible biological theory. This particular special master required us to prove that the flu vaccine specifically caused transverse myelitis by molecular mimicry. The court in Stevens struck down that requirement, but also in Knudsen. Are you talking about the error that Judge Bush found in the special master's prong 1 analysis? Yes, Your Honor. And this court in Knudsen indicated requiring specific... Can I just pursue that? As I read Judge Bush's decision, she went on and on at some considerable length about prong 1, but at the end of her analysis concluded that indeed you had a pretty good argument that the analysis that was used by the special master had heightened the burden on you improperly. And she said that was error. But it was harmless error. And it looked to me it was harmless error because she took the case off on Alfven prong 2. She indicated also that we had not proven Alfven prong 1 spectrum, Your Honor. She indicated that the... Where did she say that? Is that explicit in her opinion? I believe it was, Your Honor. Why don't you help me with that? On the A30, Your Honor. What page? A30 in Petitioner's Brief. A30? A30. There is discussion about Alfven prong 1 here. Yes. And it indicates that the special master concluded that we did not provide preponderant evidence that the flu vaccine is capable of causing T.M. First noted that testimony of Dr. Smith, we went on to hold that his testimony was unreliable because it was not supported by any of the other evidence presented by the petitioner. That was her analysis of the... Of the special master. I was looking for her actual holding on prong 1. She also indicated, Your Honor, that the empirical data did not support a finding that the flu vaccine could cause transverse myelitis. And she cited epidemiological studies... Is she there referring to the analysis? It was my impression that she was referring to the epidemiological studies that were submitted by Dr. Safran. And in those studies, it indicated that the background rate of transverse myelitis is somewhere along the lines of .5 to 8 per million. That's just the background rate. And it's a rare disorder. And when Dr. Smith was asked about those statistics, what he indicated was that the best study that was provided only had 650 subjects. I didn't mean to take up a lot of your time, but I was looking at A46 in the record page 26 of Judge Bush's decision where she said, However, to the extent that special master's analysis of the evidence on the first prong was flawed, we're convinced that any errors were harmless because she failed to meet her burden of proof on the second prong of the Alvin test. And that... Maybe I'm wrong, but I saw this as essentially a second prong analysis appeal. And I would be glad to address that, Your Honor. As you indicated that you believe this is a second prong appeal, there is tension about what constitutes a logical sequence of cause and effect. In Capizano, this court indicated that the records of treating physicians count. And in this particular instance, while there is not clear-cut statements from the treating physicians that the flu vaccine caused her transverse myelitis, there are notations in the record that indicate that it occurred after the flu vaccine. One record... Each of the doctors, almost all the doctors that saw her were aware of the fact that she had had a vaccination. Yes. And she had herself told people in the ambulance and whatnot, I've been vaccinated. So that was on the record. But unlike some of the cases we've had where there has been a doctor who actually said, I think the vaccine caused the injury, I mean, our case law that has asked the question, what was the input from the attending doctors, has looked to see whether there was expressed opinion, whether based on whatever we've accepted in our law, doctors' statements who have said, I think the vaccine caused it, without forcing the doctors to have to explain what the theory was. But I think you've agreed that particular type of statement by the doctor is not in this record. That explicit statement is not in the record. And there also is the issue of her intervening illness, the cold. And her expert saying, well, that was a problem for him. Yes, Your Honor. However, the... To me, from me looking at your case, those were the data points that were potentially injurious to your appeal. The absence of the doctor testimony and the fact that there is a potential intervening cause that her own expert had said, well, yes, that was a problem for him. And so if it's more likely than not preponderance test, you know, where the law doesn't say that the tie goes to the applicant. I understand, Your Honor. However, there is additional evidence. While these doctors do not explicitly state that her transverse myelitis was caused by the flu vaccine, Dr. Smith did draw the inference that it was caused by the flu vaccine. Specifically, in her discharge note, it indicated that she had transverse myelitis status post-flu vaccine. It didn't state status post-infection. It didn't state status post-sinus cold. It said status post-flu vaccine. Now, this court also, in Pafford, has indicated that while a petitioner is not required to rule out other causes, in situations where the evidence may be close, evidence of absence of other causes can be probative in helping her to establish preponderant evidence. And in this particular instance, all the viruses that were tested for by her treating physicians were negative, leading people to believe that this was not caused by those viruses. Now, the respondent's expert was asked specifically, are you saying that her transverse myelitis was caused by cytomegalovirus? He said no. He said no also to the cold. And he said no also to herpes zoster. He's just throwing it out as a possibility. And then, in addition, this court has stated in Capizano that if there is a very strong temporal relationship, it can also be utilized to support petitioner's preponderant evidence. One impact is that the special master act of the court below was concerned by the epidemiological evidence that came from the Begge report that showed that the incidence of TM in the unvaccinated population was no different from the incidence in the vaccinated population. Was that the situation? And I have to apologize, Your Honor. I don't remember the Begge report. That could have been an article that was submitted by the court. It involved MS. And if that is the article that I think it is, what it demonstrated there was that there was almost a doubling of reactions from the flu vaccine. Not statistically significant, but almost a doubling. And as this court indicated in Andreu, when epidemiologicals were not required to provide epidemiological studies, but when epidemiological studies are provided, they're to be evaluated through the lens of the vaccine program, not from that of a laboratorian. So while not statistically significant, there is almost a doubling. It is an indication that some people... Where do you find that? Is that in the Begge report? I didn't see that. That's my difficulty, Your Honor. I don't remember the Begge report. And I do apologize. It was relied on by the special master. I would be more than glad to address it in my one minute of rebuttal when I get on. Well, we'll let you do just that. Thank you, Your Honor. But with respect to the temporal relationship, Your Honor, this court has indicated in the Capizano that a particularly strong temporal relationship can be utilized to establish preponderant evidence. And in this particular case, Dr. Smith testified that her reaction occurred at the peak time that one would expect on the bell curve, or the immediate reaction to occur. The so-called sinus code, which was not clearly established. It was even a sinus code, and it wasn't even clearly established when it might have occurred, if it occurred, did not occur within that peak time frame. So utilizing all these pieces of evidence, which is the cumulative evidence that we have provided here, Petitioner believes that more probably than not, that they have established a case that this flu vaccine that was given to Mrs. Kate caused her transverse myelitis. All right. Thank you very much. Mr. Wishard? Good morning. Good morning. May it please the Court. The government requested you affirm the decision of Judge Bush in this case. She applied the correct legal standard under Section 13A, preponderance of the evidence. She applied preponderance of the evidence based upon each and every prong of the Alton test set forth by this court. There are specific cases that talk about each prong of the Alton test and whether or not preponderance of the evidence should apply, and they're cited in our brief. It's the government's position that each and every prong of the Alton test requires preponderance of the evidence under Section 13A. Is that consistent with our precedent? I believe it is. Is that consistent with Alton's? I believe it is consistent with Alton's, specifically Alton. In fact, in Alton, the court in Alton regarding prong one talked about the fact that the theory that must be presented must be a persuasive theory. Well, this is a plausible theory, but doesn't that say preponderance of evidence with respect to a causal connection? I would say that it talks about in terms of what theory would have to be presented in Alton. It would be persuasive, and this court since Alton has talked about what a persuasive theory would be. So petitioner must prove what? That the theory is correct? That the theory taken to its extreme is correct in its first basis, or does it prove by preponderance of evidence that it's plausible? They need to prove by preponderance of the evidence, not that it's plausible, but that it's more likely than not, meaning that there has to be some evidence to show that there's… What's the word plausibility mean then? Well, the term plausibility is more of a medical term than a legal term in terms of talking about biologic plausibility. In fact, this court several times, specifically in Moberly, talked about the fact where petitioners came before this court and talked about proving something less than preponderance of the evidence, plausibility. And the court in Moberly in several cases since then has talked about the fact, no, the standard for each and every… Well, they presented a theory that shows it can, that cause can happen. It can happen. As there was a theory presented here that cause can happen. The theory here was molecular mimicry, and the theory of molecular mimicry has been shown in general to occur for certain types of diseases. But in this particular case, when you look at the evidence that was presented to the special master, there was not sufficient preponderant evidence to show that the theory of molecular mimicry applied to the flu vaccine. Well, we don't have a finding by Judge Bush on prong one. Well, I agree with your point on that. Even though, to read your brief, you would think that you thought she ruled on prong one. Well, if you draw together some of the points that she made, I think if you look at A36 through A38, she talks about four things. She talks about that there was no error in applying Daubert when she's talking about prong one. She goes through the all analysis, and she says there was a mistake made by the special master on prong one, and therefore I'm going to decide the case on prong two. That pretty much moots prong one, and for purposes of argument, in essence, takes it out of the case. Very good. I can focus on prong two, then, in terms of this case. No, I mean, it seems to me that whether or not, even whether or not prong one required, what the test for it is, is not apt in this case because prong one was conceded out, if you will. Talking about prong two in general, the special master and Judge Bush. Just to finish up on prong one, it seems to me that in your brief you have, in effect, conceded that in this case there is some scientific basis on which one might propose a theory. And that's talking about molecular mimicry. There's several differences regarding that case than facts in this case, and the special master went through the analysis of distinguishing on prong one. We're talking about prong one still, how it didn't apply to this case. Well, the special master was worried about the finding of the epidemiological study, wasn't he? Well, he considered the epidemiological information because it was presented as evidence in the case. He didn't necessarily require Petitioner to present epidemiological evidence in this case. And those type of studies are not really required, are they? They're not required under the law, but if they are presented, the special master can take them. If one exists or is presented, as there was in this case, and it shows that the incidence is no greater than pre- or post-vaccination, that had some impact on his thinking. Certainly. It's part of the record as a whole. It's one of many factors in this case where the special master went through both prongs one and two because three was conceded in this case. If you took Beggy out of the evidence prong one, it would be a harder case, wouldn't it? I don't necessarily think so, because I think there's other evidence there, especially the testimony of Dr. Smith, which... Well, on the molecular mimicry theory. Well, I think that certainly molecular mimicry is a theory, but I don't think that the... Well, and you have Dr. Smith saying he thinks, he believes in it. Certainly. He has, but going behind what Dr. Smith said, I think that the special master properly, and we're still talking about prong one even though I know this is a prong two case in your view, that Dr. Smith saying that he believes in it, he needs something to back that up, and that's what the special master was looking for, some evidence to back up his theory that in this particular case, the flu vaccine can cause TM in general for prong one of all. And that's where I think the petitioner's evidence failed on prong one. So why is the case affirmable on prong two? Affirmable on prong two because if you look at both the special master and Judge Bush, they meticulously reviewed the petitioner's medical records and the statements from their treating physicians. And although important here is the fact that Petitioner early on, who was a nurse, brought up the fact that she had the vaccine. And so throughout the history of her medical record, that is part of the history, and yet the closest you get is Dr. Rodriguez raising it in a differential diagnosis for her initial admission diagnosis of GBS, which was later changed at the end, and they felt that she better had transverse myelitis. Dr. Rodriguez even later indicated that he did not know the etiology of her transverse myelitis after looking for a cause. Several other physicians in the medical records also raised it as part of their history, but none of them connected it to the fact that she had the vaccine, but none of them connected it to her transverse myelitis. This includes Drs. Ali, Dr. Young, Dr. Chang. Let me just tick off the factual data points that are adverse in your judgment to caves on part two of Allison. The data points that are? Well, you say the doctors. You were basically saying there's no doctor testimony that's actually making a causal link. That's correct. I believe also that if you look at Dr. Smith's testimony in terms of what he said on prong two, you have to consider obviously the theory that he came up with. I think that he failed in that regard as well. I think if you look at evidence of alternative causes, which I think is considerable under prong two, not necessarily under prong one, to me that's where Judge Bush at the end, where she was talking about prong one and talking about the harmless error, I think that's where she was sort of sending a message to the special master to sort of keep your focus in terms of your lanes. If you're looking at prong one, make sure you're looking at prong one and don't consider alternate causes, which she did in this case. But under prong two it can, and I think that there's certainly evidence here of alternate causes that was presented by Dr. Safran regarding three particular things that could be presented. Assuming that we accept your argument that a preponderance of evidence is necessary to prove prong one and prong two separately, individually, and the court says we think that you erred, special master, under prong one, and by inference there's not a preponderance of evidence there. And then she goes on and says, but I'm going to use the same evidence and the same information for purposes of prong two and I find that there's a preponderance of evidence there. Isn't that an inconsistency? I don't think so. When you say she, you're talking about the special master or Judge Bush, Your Honor. I'm sorry. Judge Bush. Okay. No, I don't think that's an inconsistency because I think that you can use all the evidence and you can consider all the evidence, as the statute says, to evaluate whether or not a non-table injury case is proven by causation and fact. And here we have the Alton test and I think it's, you can look at evidence on prong one, you can look at evidence on prong two. Evidence on one and two can, it all comes from the same bucket of evidence, but you still have to consider the evidence as a whole and I think that what she said in terms of looking at prong one, saying even if you don't consider prong one, that there was error there, although it was harmless, there's insufficient evidence here on prong two and affirms the special master. I think that was the correct approach. And in terms of looking at the statements, Fisher's counsel indicated here that if you look at some of the statements of causation, she was alleging that some of the statements tied it into the flu vaccine, post-flu vaccine. I think, again, if you look at the evidence here, really that the historical marker, it's not necessarily a statement of causation as has been before this court in other cases by a treating physician. At best, it's a temporal relationship, but it doesn't state causation. If there are no other questions, in conclusion, we would ask that the court affirm special master here and affirm Judge Bush here. We believe that the proper standards would apply and we believe that the evidence is insufficient. And remind me, this, to the extent that we have fact findings here by Judge Bush and the special master, our standard of review is deferential? What is it? Yes, it is deferential. And if you look at your recent case in Porter, it talks about the standard giving deference to the role of the special master in weighing and evaluating the evidence. That would be the Porter case. Thank you, Mr. McDonough. Ms. Chin-Kaplan, have you found an answer to Judge Clevenger's question? I did find an answer, Your Honor, and I apologize. I call this the male clinic study. The response to your question, Your Honor, the background rate of transverse myelitis in Minnesota is anywhere from 0.5 to 8 million, 8 cases per million. This is from all causes, all causes meaning from infarcts, from infections, from autoimmunity. This is an autoimmune case and autoimmunity can occur with infections as well. And to assign that because it's not the vaccination rate, the fact that vaccination causing transverse myelitis did not exceed the background rate ignores the fact that this is for all causes of transverse myelitis. It is unknown what the background rate is for influenza vaccine leading to TM. And that's the flaw with the epidemiology. Plus, Your Honor, epidemiology doesn't address a biological theory. Epidemiology is solely based on statistics. It's a calculation of numbers only. Was the evidence that was considered by the special master and then Judge Bush on prong one, did it overlap into prong two? Was there overlap in the consideration of evidence? I would say yes, Your Honor. And I say yes because what the special master required was that we provide a proof specifically that the flu vaccine caused transverse myelitis by molecular mimicry. And then he said, once you've done that, you need to prove that her transverse myelitis was caused by molecular mimicry. And in order to do that, Your Honor, the only way we could establish that would be to monitor her on a molecular cellular level from the time that she received the immunization to the time of cross-reactivity. That's certainty. That far exceeds preponderant evidence. There is no other way to establish that type of evidence. All right. But Corkow claims didn't hold you to that test. To the extent that the special master may have been holding you to the wrong test on prong one, he was criticized for that in the opinion and said, don't do that. You can't, you know, take evidence that you would use from one side and necessarily undo the prong one side. If you had had attending doctors who had testified that they believed that the vaccine had caused the transverse myelitis, you'd have a very strong case. Yeah, that's true. Very, very strong case. That's true, Your Honor. And in some of the other cases where a person was vaccinated and the flu vaccine prevailed, there was such testimony. And I would agree with you. I mean, it's a sad thing, but, I mean, the data markers, the ones that are in cases like this, and our case laws recognize the winner, the data points are the attending doctors that say, I'm willing to give my professional opinion that I believe the vaccine caused the disease. Your Honor, I would agree that there would be one piece of evidence which would be particularly probative, but the Alton Court did not restrict logical sequence of cause and effect to the testimony of treating doctors alone. It indicated that the law... No, but the law, in essence, says there has to be something more than the fact that you don't, you can't imagine what else it was. The law is clear that I don't have any other idea what it might have been is not enough to satisfy Pro 2. I agree there's been nothing explicitly stated by this court. However, when one is looking at the individual person and relying upon the medical records that are generated and anything else that occurred, you must deal with the evidence that is provided. And that includes the close temporal relationship, which this court indicated in Capizano could be very probative and support Pro 2. All right. Thank you. We have your position. The case is submitted. Thank you, counsel. We will stand in a brief recess. You're all rise. 2011-11-66, IGT against Alliance Gaming. Good afternoon, Your Honor. If it pleases the Court, Alliance contends that the district court erred when it reversed its prior two holdings and found that there was not substantial evidence by which a jury could find that wheel games are a relevant antitrust market. And I think it's clear from the record that there is ample evidence showing that wheel games are, in fact, a relevant antitrust market. To begin with, the standard, the SNP, which is a small but significant non-transitory increase in price, which hopefully you'll indulge me and allow me to call that SNP so I don't have to continue to repeat this longer version there. SNP is met here based on multiple statements in the record by IGT themselves and also based on the evidence that was reviewed by Bali's expert, Dr. Adams. When IGT was looking for high patent damages in connection with its patent infringement claim, which I believe this Court had some familiarity with previously, they had ruled that those patents were affirmed the lower court's holding on those patents. When it was faced with a high damages award, it sought price erosion damages, for example. And what IGT said in that instance was, for every time that Bali sold a wheel game, there would be drops in prices in IGT's sales of its own wheel games. And, in fact, they specifically cited to a 15% discount that it was forced to give its two largest customers. Let me ask you a question. I'm going to ask this of the other side as well because it pervades both sides. Well, I'll ask it now and then I want you all to address this maybe after the argument. There's a lot of material here marked confidential, and you're right now going into some of it. So I want to know from you all how much of that we are going to be able to address in any opinion that we might issue, how much of it is not really seriously asserted as confidential and how much is. But anyway, let's pass that for now and go directly to your argument. Sure. I'm happy to address that later whenever you would like. That's fine. So there's evidence in the record of price erosion that IGT sought in connection with its patent damages claim. And in addition to that, Bali's damages expert looked at the evidence and found significant evidence of price erosion across the board. And what that means is that IGT, when it was a wheel game monopolist, was able to charge supra-competitive prices. The record is replete with examples from their head of sales, Ron Rivera, for example, saying we never had to lower our prices before. Bali now has a wheel game. We had to lower our prices. Let me ask you two questions. One, first, your opposing counsel will, I expect, say based on the brief, that the Unitherm case demonstrates that the lost profits type analysis is not functionally equivalent to the relevant market analysis. A, do you agree with the proposition? And B, do you think that Unitherm stands for that proposition? Unitherm. I disagree on both counts. First, I think that Unitherm does not stand for that proposition. I think that Unitherm, at best, is saying that, and I think the case that you're thinking of that they're referring to is actually the cohesive text case is what they cite, I believe, for the proposition that you look at, that the technological analysis is what you look at when you're talking about lost profits in the patent case and not an economic analysis. Well, Unitherm has language which talks about the party having introduced evidence of technological substitution and non-substitution versus economic substitution. Cohesive says similarly. I think it has similar language. And grain processing, I think, addresses both when it says that actually you do look to the economic substitution as well. Well, grain processing is a lost profits case. It has nothing to do with relevant market as such. It's not an antitrust case. Right. So the question is, is one of equivalence. Are these two analytical constructs equivalent in all material respects? And are the differences merely differences of nomenclature or are they differences of substance? That's really the question. I think there is not actually even a difference. I think what is happening here is that there might be cases in which in a lost profits analysis you would look at the technological substitution, substitutability, and potentially the economic substitutability. I don't think in all cases you have evidence of both. You'd have to have. Otherwise, if there's no economic consequence to the technological difference, then you'd say no lost profits. That's grain processing. Right. Exactly. And the point is that you're always talking about damages here. Of course there's an economic component to that.  is that they make the statement that what Troxel, their expert, was talking about was technological substitution when he was an accountant and he was opining on things like competition and substitutability from an economic standpoint. And ITT's interrogatory responses are talking about the lost sales. We're not talking about a situation where factually their admissions go to technological substitutability regardless of what the standard is in the case law, which we contend grain processing supports and also Unithorm supports. You still look at the economic substitution. Absolutely. But isn't there a difference between the analysis that normally occurs in a lost profits case with whether there are substantial non-infringing alternatives and the issue that you need to address in a market determination of whether there's cross-elasticity, whether the impact of the monopolistic raising prices on elasticity, which is a somewhat different question, is it not? I would agree that in some instances the lost profits question in the patent context can be more nuanced. Here the point is that ITT overreached in its lost profits case by saying there was a one-for-one substitutability. They didn't say there are no adequately acceptable technological substitutes or the like. They said there is nothing that competes with Bally's wheel game. One-for-one. In addition, addressing the cross-elasticity question that you have, I agree that that is part of the analysis, which is why you have to look at what Dr. Adams submitted, which is the SNP test, which as you see from the price erosion, which is different than the lost profits question, also clearly demonstrates that there was a market. So there's a wide range here in the record of evidence of economic substitutability and economic evidence that supports, that the jury could rely on to find that there was a market here. I'm not saying lost profits alone. Do you think that price erosion is, again, effectively the same as, or at least parallel to, the question of, what's the term that we've been using for demonstrating relevant market? The SNP standard? Yeah, well, the SNP standard, which demonstrates, now I've forgotten the term. Price elasticity. Yes, of course, cross-elasticity of price. Do you think those are functionally similar inquiries? I think that the flip side is the same coin. I think that what is happening, and if you look at the cases, and if you see the page nine of Bally's reply brief in footnote two, we cite a host of cases that say you don't have to do cross-price elasticity. And because of that, it's a very hard analysis to do with a ton of data that you would have to go out and get to show, when here, if you have some clear price erosion data that demonstrates SNP is met, then you're able to demonstrate that there was a super competitive price that was being offered in the market, being sought and obtained by the monopolist. And then when somebody enters the market, you show that that price decreases. That evidence is the flip side of cross-price. Now, you say there's a ton of cases. You cited Whole Foods in Geneva, and that proposition, are there others that we should be looking at? Yes, if you look at page... That stand for the proposition that you don't need evidence of cross-elasticity, but price erosion is enough? Yes, if you look at page nine of our reply brief, we actually cite, and I don't know if you want me to read all these two, either on footnote two of the brief. In fact, there's quite a few. I think we cite one, two, three, four, five, six, seven, eight cases alone in just this footnote that supports the concept that cross-price elasticity does not necessarily need to be reached in order to demonstrate that there's a market, that the SNP test is what's accepted by the horizontal merger guidelines and adopted by the Unitherm case. To what extent do you have to demonstrate price erosion in order to, with respect to your argument about the market? The standard that has been adopted by the horizontal merger guidelines is 5%, and that shows that there's a 5% decrease in the price. Here, our expert, Dr. Adams, submitted a report, which IGT actually ignores in its opposition, showing that IGT wheel game prices fell from 5.9% to 14.7%, which is a very significant decline directly attributable to Valley coming in with a wheel game. And I think it's important to note that that is taken in the context of their experts and their interrogatory and their back witnesses saying it's a one-for-one replacement. It is even stronger evidence. I'm actually out of time. If you don't have any questions, I want to save some time for my rebuttal. Sure. Yes, we'll save the rest of your time for rebuttal. Thank you. Here's Nathan. May it please the court. My name is Deanne Maynard, and I represent the appellee IGT. The district court correctly concluded that there is no jury question here as to whether or not wheel-shaped bonus games, as opposed to games of any other shape, with or without a bonus, are a separate antitrust product market. And Valley's evidence essentially boils down to two things, number one, neither of which is sufficient to get to the jury on this question. One, our evidence of lost profits, our Panduit damages evidence, and two, their experts' testimony of an alleged price drop after their entry into the market. Neither of those, at best, both of those simply show that the Monte Carlo wheel game and Valley's wheel game and our wheel game and other wheel games are in the same market. But they don't put boundaries around the market, which is what's required under the Supreme Court's test to establish a separate antitrust market. So with respect to our lost profits analysis, to go to your question, Judge Bryson, about Unitherm. Unitherm says, I don't think this court has to hold that Unitherm holds as a blanket matter that no Panduit inquiry would ever, depending on what the evidence was, establish an antitrust market. But what Unitherm does establish is that Panduit evidence to which they point in this record is not enough. Our experts... How do you... In what respect do you think Unitherm says that? I read that portion of Unitherm carefully and it seemed to me that the evidence in that case was much weaker than the evidence here. The evidence with respect to our damages expert's testimony is essentially analogous to the evidence in that case. So the evidence in that case, I take issue with counsel's description because I think that evidence in the Unitherm case was also economic evidence. The Panduit inquiry is an economic inquiry. It's a different economic inquiry though. But the patented product and the infringing product would have an exchange out one to one. And so in the Unitherm case, what happened in that case, ironically enough, was about a golden brown color. Here we have shapes, there we have colors. That process there created a golden brown color on cooked meat. And what their expert was saying was an antitrust market was processes that create that golden brown color. And that was itself a relevant antitrust market. And defined the market by the patented feature, the golden brown process color. The process that created the golden brown color. That's exactly what our damages expert did here. All he did, he testified in his deposition, it's at A13520, that he did not do a cross-elasticity analysis, our damages expert. He said, if I were to do that, I have to consult an economist. But even though there was no technical formal cross-elasticity analysis, is the evidence relating to the patent nonetheless an issue that has some bearing on the market determination? Yes, Judge Lin, it could have some bearing, but it isn't sufficient. Because we're talking about summary judgment here, and the question is whether there's enough to raise a genuine issue of material fact. Right. And it would be relevant, I would say, but it isn't sufficient to get you to a jury. And they don't have enough to get you to a jury here. I mean, under the Supreme Court test, Matsushita, Matsushita, Matsushita, expert testimony alone isn't enough to get you there, especially when you're talking about something that's really implausible, like here. There's a wheel-shaped market. You know, here's the thing that bothers me about the inquiry into implausibility. I mean, normally we assume consumers are rational, they make rational decisions on economically rational grounds. But we're dealing with an industry here that appeals to not, well, with apologies to the industry representatives that may be here, to the less rational aspects of human behavior. That is to say, people that respond to bells and whistles. And we'll put large amounts of money into a machine because it makes a lot of noise. So I'm not sure that saying, well, just a wheel is silly. I mean, what's the difference between a wheel and a square? Well, if the evidence is that to at least the kinds of folks that frequent casinos, if it does make  if that difference is demonstrated by something like price erosion, it seems to me it's not something you can readily dismiss as kind of silly. Well, a couple of responses. One, the relevant consumer here is the casino. Well, the casino is responding to the customer. And so I don't think you can really say, well, the casinos are rational actors. Of course they are. But they're rational actors dealing with, if I may, an irrational set of purchasers. And they are keenly aware of the particular features of that irrationality and they take advantage of it. So I don't think you can shield the irrationality perhaps of liking a wheel by saying, well, but casinos are rational. Even if one takes the Matushita inference out of it, there still isn't sufficient evidence here to get to a jury because at most all they've shown is that wheel games are in the same market with other wheel games. What they haven't shown, Judge Bison, is they have no evidence suggesting that if the price of wheel games were to rise by a small but significant non-transitory amount, that casinos wouldn't shift to tower bonus games or square bonus games or any of the other bonus games that are pictured in our brief. And that's the kind of evidence that they would need to establish an antitrust market for a jury to conclude, for you to let this go to a jury to find that there is a separate market for wheel games. Back to the Panduit analysis, the evidence our expert offered, our expert on Panduit, offered is exactly analogous to the Uniform Testimony there because all he did was, and he testified in his deposition, this is all he did, I looked at every time a casino had bought a Valley wheel game and I decided that would have been a lost sale. He was told there were no non-infringing substitutes and so he just did it. I counted that as a vote for a wheel game and that that may not have been a successful Panduit theory if it had ever gotten to trial but whatever else it is, it's not an antitrust relevant market. Now, would you agree that if there had been evidence across the elasticity of demand, such as, for example, evidence that it was possible to raise the price on the wheel game by 10% without losing any significant amount of your market, would that be enough to establish a triable issue for a relevant market being wheel games? If there was the relevant duration, so that it would have to be... Okay, for a year. Right. Yes, Your Honor, that would be, but there's nothing like that in this record and the price erosion is not... Why isn't the price erosion fully equivalent to the cross-elasticity of demand? Because the price erosion, again, when you're talking about a differentiated market, and this is, you know, the cellophane case in the Supreme Court, the consolidating can case, when you're talking about the super premium ice cream case out of the Ninth Circuit, we're talking about a differentiated product market. One would expect that if you have a premium product, upon entry, for there to be some price drop. And that does nothing. So say I'm Colgate and I decide I'm going to, I invent adding whitening to toothpaste. Right? And I'm the first one to do it. And I can charge more for that because I have this toothpaste with a special feature that people like, stop whitening. Well, Procter & Gamble is going to have, they're going to come along and they're going to put whitening in their toothpaste and then they're going to join the market. So for that time when I'm the first one, I'm going to be able to charge more. And when they enter the market, you're going to expect my price to drop. But that doesn't mean there's a separate antitrust market for toothpaste with whitening. All it shows is that in the spectrum, along the spectrum of toothpaste products, those two are competing. And, you know, but if I had a patent, if I were Colgate and I had a patent on the whitening and I could sue them for selling an infringing product, you might have a one-to-one panic damage claim. But suppose that, to take your example, suppose that the computing company hasn't developed a whitening feature, whatever it is, and it turns out that your whitening feature is very popular. In fact, you say, whoa, we can really make a killing on this, and you raise the price 40 percent on your whitening toothpaste, and you don't lose any market. You don't lose any market share. Isn't that exactly the kind of proof that would be sufficient to say that the price went down to when there was competition? Isn't it a fair inference that the higher price was super competitive because we know the lower price was competitive, or at least we can assume it was? No, Your Honor, under economic theory, if you're in a differentiated product market where something is like super premium ice cream, you know, Haagen-Dazs and Ben and Jerry's are competing on one spectrum. If Haagen-Dazs is there alone in that area of the spectrum and then Ben and Jerry's comes in, you can expect Haagen-Dazs to reduce their prices as a result of Ben and Jerry's. But it doesn't mean that the super premium ice cream doesn't  So we have to let a jury decide that real games compete only with real games and that they're their own market. If I could address the evidence that they point to more in their reply brief than they did in their opening brief, yes, Table 1, I'd encourage the court to look at the backup to their expert supplemental report. It's at A25064. You know what tab that might be? Yes, sir, it's at tab 87. 87, thank you. While you all are looking, I'll get the lead in. In their reply brief, they say we didn't respond to their point and I think that's a significant price drop. All the declaration says is there's been an average price drop over a range of multiple years. But when one looks at the actual supporting detail, which is at A25064, you'll see the relevant column is at the far right column, the IGT covered field games. And what their expert says is the relevant numbers, so I'll work with his numbers, is the bottom half of the chart, which is the effective prices. So if you see, they entered the market in November of 2002. Under their theory, in 2003, you'll see, for example, the lease, 7154 in 2003. Our effective price then went up in 2004. And it went up again in 2005. And the same with participation, it went up for one year. It was up in 2004. And then somewhat anomalously, it went down in the contribution. So if their theory isn't backed up, he's only able to say that our prices dropped over that range of years by averaging it together. But if their theory is right, you would expect that our prices would have dropped immediately upon their entry, but they did not. So even if one theory is relevant, but it isn't sufficient, and they don't have anything, as I said at the beginning, what the Supreme Court test is looking for is the boundaries. They have no boundaries. They can't draw the boundaries around real games. All they can establish is that real games compete with one another, but this is a differentiated market along a spectrum, just like super premium ice cream. And sure, Ben & Jerry's competes with Haagen-Dazs, but it also competes with Steelcat and Breyers and everybody in between, and they don't have any evidence to get a boundary around real games, and how could they, right? I mean, there's a case A, let's say, a sub-market in hybrid vehicles, where we can intuitively think that there's a class of people that really want to buy a hybrid vehicle, let's say an electric car, to make it even easier, who really want to buy an electric car. My gosh, they will pay $40,000 for an electric car.  not going to be influenced by the increase in price. They're committed. That makes sense to say that that's a sub-market or a market. There may be another group of people out there who really, really think it's important to have heated seats in their car, and they will pay a huge premium for heated seats, and they're not going to be much influenced about price discrepancies if they can get those heated seats. That sounds much less compelling a case, but if the economic evidence is the same, why isn't that enough to establish there is a sub-market in heated seat cars? So lay aside intuition. You have to have proof of cross-elasticity of demand. You have to have proof of the SNP test, and they don't have that. So that's your hypothetical. Whole Foods, there was evidence precisely of that, that the price went up and people wouldn't switch from their premium grocery store to a regular grocery store. So that's the kind of evidence they need, and they don't have that. Doesn't price erosion demonstrate that? No, it doesn't, because that's just the price drop evidence. All that shows is that we do compete, that wheel games are within some market that compete, but it doesn't draw the boundaries around wheel games. So it's back to the super premium ice cream. And you could assume, so you could also think super premium ice cream is, intuitively, super premium ice cream is its own market, right? But without proof of cross-elasticity, without the SNP test proof, you don't let that go to the jury. In Whole Foods, they have that evidence. Here, they don't. They don't have any proof of gain. Looking at Mr. Troxell's testimony, for example, he's asked about price elasticity. He says it's not an important issue, but I interpret, I'm sorry, I should redirect you to the passage, that's at 13,520. May I extract it? Sure. I'm sorry, it's tab, I'm not being very helpful here, it's volume 2. He says price elasticity is not a very important issue, and at first I thought, well, that means he's not addressing price elasticity, but if you read the rest of his testimony on 13,521, he seems to think that the reason it isn't important is because there was elasticity, there was no price elasticity in this case, because what he says is, I didn't think price elasticity was an important issue, and skipping to 13,521, the wheel had such a demand and such drawing power from consumers that, and because of the pricing arrangement whereby the casino would still be making money, it seemed to me that the price elasticity issue we can charge whatever we want are pretty close. Is that a fair inference? No, I don't think you can infer that when on the page before, in the sentence right before what you were reading, so line 18 to 21, he's asked, when I get into price elasticity issues, I'm reading from line 16, when I get into price elasticity issues and I feel I have to measure price elasticity, then I would invariably involve an economist who is experienced in calculating that price elasticity. And you did not do that in this case? No. So the rest of it is just complete supposition. Well, but is it? Because he goes on after the passage I read and says price elasticity occurs when you have products that are of a nature that price is going to make a difference for the consumer and whether or not they would move to a different type of product. In this case, the wheel was what they wanted. Well, that seems like he's saying I didn't have to inquire into price elasticity because there isn't any. Except, I think when you look in the context of his whole testimony, so back on, several pages back on 13-5-10, you see, all he did was assume that every time Bali sold a machine with a wheel, IGT would have sold that machine. I mean, the casino has voted. The casino said, I'm going to have a wheel. And all I'm doing is counting up those votes and saying, indeed, these are the casinos that want wheels. So I just think, no, I don't think you can infer from his testimony because he didn't do a price elasticity analysis that that would be evidence of price elasticity. Okay. I understand. Do you have any questions? Okay. Very well. Thank you. We would request your deference. Thank you. We will hear rebuttal now. I agree with your statement there about what Mr. Troxell was saying. And to the extent there's any disagreement, that's something that the jury should be able to determine. Meaning, Troxell is said there's ample evidence where Troxell is making statements about price elasticity and discussing this one-for-one replacement. Those are facts that are now in the records. The jury can take a look at and make a determination itself as to whether or not there's real games or relevant market. Same thing with the price erosion information that we provided. Same thing with the SNF test. In fact, ITT was incorrect when it said there was not any evidence other than the expert testimony. Ron Rivera, their head of sales, said specifically, and this is in the record, he said that they got pressure before to lower their wheel game prices by all of their customers, but it was not until Valley had a wheel game and they were able to then say, hey, if you don't lower your prices, we'll put in a Valley Monte Carlo wheel game. It wasn't until then that ITT was forced to lower its prices. So while I agree that the document that there might be some fluctuation as to when the price erosion was at its peak in a market, markets fluctuate, ITT themselves relied on that evidence to argue for over $60 million in price erosion damages based on that same market. And the boundaries were in fact created. They were created by ITT. As you recall, it's not the case that you always have a situation where a patent gives rise to a market, but where you have somebody who is zealously trying to protect the space by our allegations excluding competitors from that space by litigation and by tying them up in agreement because of the fact that  market is the most profitable slot machine ever based on its feature being a wheel, which is by the way a game of chance. A wheel's been around for a long time I think in the gambling world. Then you do have a market where you've identified it clearly based on the efforts to preserve it, the clear ability to charge super competitive pricing, the impact of price erosion on it, and the analysis that Dr. Adams did of the most nearest substitute which was a premium bonus reels game where it had a secondary feature which was the reels instead of the wheels, and his analysis showed that in that instance the same type of game there was not price erosion when Valley's wheel entered the market. But isn't it the case, as Ms. Maynard suggests, that if you have a share of a product in a highly competitive market I'd say that you will get a price opportunity bump while the novelty remains a novelty and then as soon as everybody else adopts it your price comes down. I mean the example of cupholders that go even sillier than heated seats, you could cupholders presumably cost a car manufacturer almost nothing to install, but the price increases and you might get a few hundred extra bucks from people that just like having a bunch of cupholders in their van. Presumably the first company that put in cupholders would be able to charge a premium and it would come right down as soon as somebody else put in cupholders. It's strange to think of there being a sub-market of cupholder equipped vans, don't you think? Potentially, but consumers are strange. I think that the point here is Well, that has not so much to do with the strangeness of the consumer. It has more to do with the way markets operate when somebody brings in a novelty. This is the point that Ms. Maynard was making with the toothpaste. But I don't agree here that this is what we're talking about as novelty. I mean you're talking about something that at least one company went to great lengths to seek a patent on and paid $164 million for those patents. We're talking about a feature that was touted as the most successful and innovative that there is. The concept of a spinning wheel like a roulette wheel, like a game of chance being added to something in the casino space is a very defined thing. I think the economic evidence shows Ron Rivera's testimony, Troxel's testimony, that customers when they wanted a wheel they had to have a wheel. And the point here is that there were no competitors in the market because ITT excluded them and it wasn't until with their patents that were now known to be invalid. And it wasn't until Bali came in with another wheel that we saw the decline in prices. And the reason for that is that we think both counsel in both cases were a very helpful argument and the case is submitted.